UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MISSOURI
EASTERN DIVISION

RODERICK EDWARDS,⠀⠀⠀⠀⠀)
⠀⠀⠀⠀⠀⠀⠀⠀⠀⠀⠀⠀⠀⠀⠀⠀)
⠀⠀⠀⠀⠀Plaintiff,⠀⠀⠀⠀⠀⠀)
⠀⠀⠀⠀⠀⠀⠀⠀⠀⠀⠀⠀⠀⠀⠀⠀)
vs.⠀⠀⠀⠀⠀⠀⠀⠀⠀⠀⠀⠀)⠀⠀⠀⠀Case No. 4:08CV343 HEA
⠀⠀⠀⠀⠀⠀⠀⠀⠀⠀⠀⠀⠀⠀⠀⠀)
UAW LOCAL 282,⠀⠀⠀⠀⠀⠀)
⠀⠀⠀⠀⠀⠀⠀⠀⠀⠀⠀⠀⠀⠀⠀⠀)
⠀⠀⠀⠀⠀Defendant.⠀⠀⠀⠀⠀)

## OPINION, MEMORANDUM AND ORDER

This matter is before the Court on Defendant UAW Local 282's Motion for Summary Judgment, [Doc. No. 112], and Defendant MSX International Platform Services, LLC's Motion for Summary Judgment, [Doc. No. 113]. Plaintiff opposes the Motions and the matters are fully briefed. For the reasons set forth below, the Motions are granted.

Count I of Plaintiff's Second Amended Complaint alleges that his employer, Defendant MSX International Platform Services, LLC., ("MSXI") discriminated against him based on his race in violation of Title VII of the Civil Rights Act of 1964, 42 U.S.C. § 2000e.

Count II of Plaintiff's Second Amended Complaint alleges that Defendant UAW, Local 282 (Union) breached its duty of fair representation in prosecuting his grievance against his employer, Defendant MSX International Platform Services,

LLC., ("MSXI").  Plaintiff alleges the Union failed to devote its full time, effort and

attention in prosecuting the grievance following Plaintiff's termination on December

14, 2006.

## Facts and Background

MSX International Platform Services, L.L.C. ("MSXI" or "the company") is

a Michigan corporation with its principal offices located in Warren, Michigan   At

all times relevant hereto, MSXI operated an automotive wheel assembly plant

in St. Louis County, Missouri ("the plant").  The plant was the exclusive supplier of

wheel assemblies for the van and truck assembly plants operated by Chrysler

Corporation ("Chrysler") in Fenton, Missouri.  The plant was what is referred to as

a "just in time" supplier, meaning that it provided wheel assemblies for vans and

trucks as those vehicles were being assembled at the two Chrysler plants.

At all times relevant hereto, the plant's full-time warehouse and maintenance

employees were represented for collective bargaining purposes by UAW Local 282

("Local 282," "the Local" or "the union").  Local 282 is affiliated with the

International Union, United Automobile, Aerospace and Agricultural Implement

Workers of America ("the International Union," "the International" or "the UAW").

On May 13, 2004, the company entered into a collective bargaining

agreement ("the Agreement" or "the CBA") with the Local and the International for

the roughly four year period beginning May 13, 2004, and ending May 10, 2008. The Agreement governed the terms and conditions of employment of the plant's unionized workforce.

Article IV(13) of the Agreement authorized MSXI to adopt, revise and enforce working rules. Pursuant to Article IV(13) of the Agreement, the company promulgated a Code of Conduct by which gross negligence resulting in damage to company property was a dischargeable offense.

The plant was divided into two production areas. One production area assembled the wheel assemblies for the Chrysler van plant and was referred to as "the van line" or "the van side." The other assembled wheel assemblies for the Chrysler truck plant and was referred to as "the truck line" or "the truck side."

Both production areas were broken down into five stations. The wheel assemblies, consisting primarily of tire, wheel and weight components, were assembled at the first four stations. They were then inspected at the fifth station, known as the Audit Ship Station, before being placed into trailers for shipment to the two Chrysler plants. A conveyor ran from station to station and then transported the finished wheel assemblies from the Audit Ship Station to the plant loading area for shipment. Wheel assemblies were grouped in sets of five (four tires and a spare) corresponding to each vehicle being assembled at the Chrysler plants.

MSXI warehouse employees rotated between the five stations, spending between one to two hours per shift at each station. When assigned to the Audit Ship Station, it was the warehouse employee's responsibility to inspect the wheel assemblies as they came down the conveyor and to remove and replace those that were damaged/defective. Plaintiff avers that the temporary staffing agency worker, Terrill Jones, was also responsible for inspecting the wheels for damage or defects. Following inspection, the Audit Ship Station attendant was required to push a button to allow the wheel assembly to continue down the conveyor to the loading area.

Plaintiff, an African-American male, began his employment at the plant in August, 2004. Thirty days thereafter, pursuant to the union security provision set out in Article V, Section 1 of the CBA, Plaintiff became a member of Local 282.

Until his termination in December, 2006, Plaintiff worked the first shift as a warehouse employee on the van line.

On December 5, 2006, 139 damaged wheel assemblies passed through the van line Audit Ship Station without detection. Plaintiff testifies in his affidavit filed in response to the Motion that he knows of only one damaged wheel assembly. Further, he avers that he removed it and stopped the line so maintenance could inspect the line to determine the cause of the damage.

Second shift employee Jimmy Beck ("Beck"), an African-American who

served as the Local 282 committeeman (in-plant union representative), was called in early that day by first shift supervisor Keith Maxwell ("Maxwell") to review the matter. Maxwell informed Beck there was a "trailer issue" involving Plaintiff. Beck examined all of the finished wheel assemblies on the conveyor in the van line loading area, known as "the accumulator," and some that had already been loaded onto the trailer. All of the more than 30 wheel assemblies Beck examined had clearly visible gouges to the crown or rim area of the wheel component and should not have cleared the Audit Ship Station for shipment to Chrysler. Beck wrote down the identifying information, referred to as a "sequence number," that appeared in chalk on both the wheel and tire components of each of the wheel assemblies he inspected. Beck then went to the plant office and had the secretary pull up and print out a copy of the van line Audit Ship Station log from her computer. The Audit Ship Station log disclosed that all of the damaged wheel assemblies Beck observed had passed through the van line Audit Ship Station earlier that day during the time Plaintiff was assigned to that post. Later that day, Beck received a list from second shift supervisor Marvin Brown ("Brown") providing, in order, the sequence numbers of all of the damaged wheel assemblies uncovered by the company (referred to as the "dirty point-clean point" list). The sequence numbers of the damaged wheel assemblies Beck observed earlier

that day (December 5, 2006) all appeared on the "dirty point-clean point" list and

his further review of the van line Audit Ship Station log disclosed that all of the

wheel assemblies on the company's list had cleared through the Audit Ship Station

during Plaintiff's watch.

On Wednesday, December 6, 2006, Beck was again called into the plant prior

to the start of his shift. This time it was at the request of Plaintiff who had been

informed earlier that day of the company's decision to suspend him pending

investigation into the preceding day's events. Immediately following the suspension

meeting, Beck met with Plaintiff and together they drafted a grievance protesting

Plaintiff's suspension which Beck turned in to the company.

The grievance provides in relevant part:

Roderick was at AudShip when bad product came through the line
that shouldn't have. Maintenance should have caught it. This was
a machine issue not production.

On Friday, December 8, 2006, Beck went to the plant prior to the start of his

shift to investigate Plaintiff's claim, as set out in the suspension grievance, that those

in plant maintenance were responsible for the defective wheel assemblies.

Maintenance employees check the first five sets of wheel assemblies when

production resumes following van side breaks. Beck first checked the Maintenance

Log for the sequence numbers of the wheel assemblies inspected by maintenance on

December 5, 2006. The sequence numbers of those wheel assemblies did not match the sequence numbers of any of the damaged wheel assemblies Beck viewed on December 5, 2006, or the sequence numbers on the "dirty point-clean point" list received from second shift supervisor Brown. Beck then talked to MSXI maintenance employee Collin Forsyth ("Forsyth"). Beck also spoke with MSXI warehouse employee Ken Hendrickson ("Hendrickson") who was working the Weight Station during the time in question on December 5, 2006. Plaintiff acknowledges it was Hendrickson who observed damage to the wheel component of a wheel assembly as it made its way down the van line and notified Plaintiff who, in turn, informed the van line maintenance supervisor. Beck also spoke with the first shift van line employees who were working the Wheel and Tire Stations during the time in question on December 5, 2006. Beck did not speak with Terrill Jones who was working the audit Ship Station with Plaintiff.

On Thursday, December 14, 2006, the company terminated plaintiff for gross negligence. The termination notice issued to plaintiff provides in relevant part:

> On December 5, 2006, it was reported that there were numerous damaged (visible scratches and gouges) wheel assemblies [allowed] to pass the audit ship station during the time you were working that station. These assemblies were allowed to reach the delivery trailer and, ultimately, the [Chrysler van] assembly line. This

resulted in assembled vehicles being pulled out of completed status and removed to a repair lot.

The role of the audit ship station is to ensure that no damaged or otherwise substandard material ultimately reaches the customer.

Through our investigation it is concluded that you allowed numerous damaged wheel assemblies to pass the audit station, constituting gross negligence. This negligence places MSXI at risk with our [Chrysler] customer. MSXI is also responsible to bear any and all associated costs of this negligence.

The company's investigation disclosed that 139 damaged wheel assemblies passed through the Audit Ship Station on December 5, 2006, without detection by Plaintiff.

On December 19, 2006, Plaintiff met with Beck at Local 282's office to prepare grievances protesting his termination. Grievance No. 030582 provides that Plaintiff was unjustly terminated "because of race, and pas[t] issues between him and MSX." Grievance No. 030583 notes that plaintiff was unjustly terminated. Plaintiff and Beck drafted and signed the two grievances. Thereafter, Beck submitted the grievances to the company.

Article XXIX of the MSXI-Local 282 collective bargaining agreement provides for a multi-step grievance procedure culminating in final and binding arbitration. The Local is responsible for processing grievances through the first two steps of the procedure. If a grievance remains unresolved after the second step, the

Local can either withdraw it or appeal it to the third step. Per Article XXIX of the Agreement, grievances taken to the third step are then handled by the International Union representative who services the Local.

In the instant matter, the Local was unsuccessful in its efforts to favorably resolve Plaintiff's discharge grievances and in early February, 2007, appealed both to the third step, at which point UAW servicing representative Jim Wideman ("Wideman") took over their processing. Wideman worked out of the International's Region 5 offices in Hazelwood, Missouri.

Wideman became a UAW servicing representative in 1999 and retired at the end of 2009. As a servicing representative, one of Wideman's primary responsibilities involved grievance processing.

Prior to his employment by the UAW, Wideman worked from 1973-1999 at the Chrysler assembly plants in Fenton, Missouri. During virtually all 26 years of his employment with Chrysler, Wideman held office in one or the other of the two UAW Locals that represented the hourly production and maintenance workers at the two plants and was continuously involved in grievance processing during that period. Wideman is not an attorney. Wideman had limited involvement with Plaintiff's discharge grievances before they reached the third step of the grievance procedure.

Upon receiving the grievances from Local 282 committeeman Beck on December 20, 2006, the company took the position they were untimely. It was plant management's position that pursuant to Article XXIX, Section 2, Step 1 of the Agreement, the grievances had to be filed within five days after Plaintiff's termination, which meant no later than December 19, 2006. The two grievances reflect that they were not turned into the company until December 20, 2006 Committeeman Beck sought Wideman's assistance respecting the company's claim of untimeliness. Wideman convinced MSXI corporate official Rob Miller that the grievances were timely pursuant to Article XXIX, Section 6 of the collective bargaining agreement which allowed the Local ten days to grieve disciplinary actions:

> Section 6. . . . Such disciplinary action shall be deemed final and automatically closed unless a written [grievance] is filed within ten (10) days from the time of presentation of the notice to the employee representative.

Wideman had also been made aware of the incident giving rise to Plaintiff's discharge by officials of UAW Local 110, which represented the hourly production and maintenance employees at the Chrysler van plant which Wideman also serviced. The Local 110 officials complained to Wideman that removal of the defective wheel assemblies from the Chrysler vans was being performed by a non-union firm rather

than Chrysler's unionized van plant workforce.

Following removal from the vans, the defective wheel assemblies were returned to the MSXI plant and before year's end (December 31, 2006), the tires were separated from the defective wheels and placed back into inventory while the wheels were discarded.

On the three to four or more occasions Beck was assigned to this task, he checked the sequence numbers on the returned defective wheel assemblies with the sequence numbers on the Audit Ship Station log he had been given by the plant secretary on December 5, 2006. All of the returned defective wheel assemblies "broken down" by Beck had passed through the Audit Ship Station during plaintiff's watch on December 5, 2006.

Immediately upon receiving plaintiff's discharge grievances, Wideman arranged a third step meeting with MSXI corporate and plant officials for February 21, 2007. Prior to the third step grievance meeting, Wideman met with Local 282 committeeman Beck for two hours at the Region 5 offices. At their meeting Beck provided Wideman with a full account of the matter (everything that happened from "A to Z"), including his investigative efforts, and turned over all of his paperwork to Wideman. Beck also met on other occasions with Wideman regarding plaintiff's discharge grievances.

At the February 21, 2007 third step meeting, the company refused to return plaintiff to work. Wideman put the grievances on hold to buy more time to try to convince the company to reinstate plaintiff. Wideman did not use this additional time to meet with or talk with Plaintiff or Jones. Wideman was able to persuade MSXI corporate human relations official Rob Miller ("Miller") in an "off the record" discussion to return plaintiff to work without backpay. Plaintiff avers in his affidavit that no offer of reinstatement was delivered to him. Wideman testified that Plaintiff rejected the offer. Wideman and Beck aver that Wideman asked Beck to meet with Plaintiff, while Plaintiff avers this meeting never occurred.

Beck had previously been terminated for an incident that caused one of the Chrysler plants to shut down production for a few hours and Wideman had been successful at the third step of the grievance procedure in persuading the company to reinstate Beck without backpay.

Wideman arranged for a second third step grievance meeting was and in connection therewith asked the company to provide him with all evidence to support its termination decision. By memorandum dated April 13, 2007, the company provided Wideman with information and photographs respecting Plaintiff's failure to detect the damaged wheel assemblies when they passed through the Audit Ship Station on December 5, 2006.

On April 23, 2007, plaintiff filed Charge of Discrimination against Local 282 with the Missouri Commission on Human Rights ("the MCHR") and the Equal Employment Opportunity Commission ("the EEOC") complaining that "he was not being properly represented," because he had filed a prior Charge of Discrimination against the Local.  On that very same date, April 23, 2007, Plaintiff filed Unfair Labor Practice Charge against Local 282 with the National Labor Relations Board ("the NLRB") alleging that the Local "fail[ed] to properly process" the grievances filed protesting his termination.

On October 16, 2007, following investigation and "a thorough consideration of the evidence," the MCHR issued a finding of "No Probable Cause" respecting Plaintiff's Charge of Discrimination.  In an accompanying document captioned "Terms and Conditions/Retaliation," the MCHR noted that there was no basis for Plaintiff's claim of not receiving proper representation in retaliation for having filed a prior Charge of Discrimination against the Local.

Approximately two years earlier, on November 18, 2005, plaintiff filed Charge of Discrimination against the Local with the MCHR and EEOC alleging unfair representation by the Local because of his race.  The MCHR's investigation of that charge disclosed that it too was without merit:

The investigation of [your charge against UAW Local 282] has

been completed. After a thorough consideration of the evidence, a finding of No Probable Cause has been made.

Between November 28, 2005, the date plaintiff filed his first Charge of Discrimination against the Local, and his termination by MSXI in December, 2006, the Local pursued four grievances at Plaintiff's request and on his behalf.

In Grievance No. 064255, filed on January 6, 2006, Plaintiff complained that the company was not properly applying the seniority provisions of the CBA when it came to layoffs and recalls. By memo dated January 31, 2006, that grievance was favorably resolved at the third step of the grievance procedure with the company agreeing that all future layoffs and recalls would be based on plant-wide seniority, not shift or production side seniority.

In Grievance No. 030870, filed on March 31, 2006, Plaintiff complained that the company had improperly moved an employee on light duty from the truck line to the van line. That grievance was withdrawn by the union, because there was nothing in the CBA prohibiting the company from taking such action.

On June 14, 2006, the Local filed two grievances on Plaintiff's behalf. In Grievance No. 030864, Plaintiff complained that employees less senior than he were selected for Sunday overtime. In Grievance No. 030865, plaintiff who was regularly assigned to the van line protested being forced to work overtime on the

truck line. Memorandum issued by the company dated November 9, 2006, reflects favorable disposition of Grievance No. 030865 at the third step of the grievance procedure:

> In the absence of a legitimate business reason "employees will not be required to work any additional hours on the other production line.

Grievance No. 030864 was withdrawn at the third step of the procedure upon the company's demonstrating to Wideman that it had followed the proper procedures for Sunday overtime.

By letter dated June 30, 2007, NLRB Region 14 notified Plaintiff of the dismissal of his unfair labor practice charge against the Local. As noted in the dismissal letter, the NLRB concluded there was insufficient evidence to establish Plaintiff's claim of unfair representation in connection with the processing of his discharge grievances. Plaintiff filed his complaint with the NLRB because the Union had not contacted him at all despite the fact that the grievance had reached the third step and in fact on third step meeting had taken place.

The Local and company conducted a second third step grievance meeting regarding Plaintiff's discharge grievances on May 2, 2007. Wideman did not interview or talk with Plaintiff or Jones prior to the third step meeting. Again, the company refused to return Plaintiff to work. At the conclusion of the meeting,

Wideman, who could have accepted the company's denial of the grievances and withdrawn them at that time, informed those company officials in attendance of the union's intent to submit the grievances to arbitration, as provided for in Article XXIX, Section 8 of the CBA.

Article XXIX, Section 8 of the CBA also provides for the arbitrator's expenses to be shared equally by the company and union.

By letter dated May 23, 2007, Wideman informed Plaintiff of the company's denial of the discharge grievances at both third step meetings and of the union's intention to take them to arbitration. This was the first time Wideman had contacted Plaintiff.

On August 22, 2007, Plaintiff met with Wideman at the UAW Region 5 offices to prepare for the arbitration hearing. At that meeting, Wideman asked Plaintiff to provide him with a list of those individuals Plaintiff wanted to testify at the arbitration hearing.

The next day, August 23, 2007, Plaintiff returned to the UAW Region 5 offices to drop off his list of witnesses. Of the six individuals listed, Wideman was only able to contact three - Armando Saucedo, Terrell Jones and Randy Watson. Wideman had no success in contacting the other three individuals on Plaintiff's list - Matt Barlow, David Jordan and Hasaan Pruitt ("Pruitt") - and so

advised Plaintiff who likewise did not know how to reach them.

On September 17, 2007, Wideman and company officials selected Mark W. Suardi to arbitrate the discharge grievances.

In early October, 2007, the company, by plant manager Scott Snyder, conveyed monetary settlement offer to Wideman of $8,000.00, net of taxes and other withholdings, in exchange for a release from Plaintiff waiving reinstatement. Plant manager Snyder asked Wideman if he would be willing to meet with Plaintiff to convey the company's offer. Wideman agreed to do so and the next day received from Snyder by overnight mail a check payable to Plaintiff in the sum of $8,000.00 and a release form. Wideman met with Plaintiff at the UAW Region 5 offices to review the company's settlement offer which was unacceptable to Plaintiff. Plaintiff, however, did inform Wideman that he would be willing to forego reinstatement if the company agreed to pay him $30,000.00. The company rejected Plaintiff's counteroffer and Wideman returned the settlement check and release, first making copies of those documents for his file.

In early November, 2008, Wideman informed Plaintiff that a hearing on Plaintiff's discharge grievances was scheduled for January 22, 2008, before Arbitrator Suardi. On at least three to four occasions (dates uncertain), Wideman met with Plaintiff at the UAW Region 5 offices to prepare for the arbitration

hearing. Each meeting lasted between 45 minutes to an hour.

At each meeting, strategy was discussed, including how best to present the grievances at hearing. Plaintiff avers that he stated clearly that he did not allow 139 damaged wheel assemblies to pass through the audit ship station.

In addition to their meetings, Wideman and Plaintiff also spoke over the phone. Wideman estimates that he had at least 25 phone conversations with Plaintiff prior to the January 22, 2008 arbitration hearing.

On January 15, 2008, Wideman held a meeting with plaintiff and others at UAW Region 5 offices to prepare for the upcoming hearing. The meeting got underway at 9:30 a.m. with Wideman, plaintiff and Local 282 committeeman Beck. Jones, the temporary staffing agency employee assigned to assist at the Audit Ship Station on December 5, 2006, and one of the six individuals on Plaintiff's witness list called when the meeting started to say he could not attend, but assured Wideman he would appear and testify at the January 22 hearing.

Later that day, January 15, 2008, Wideman called Jones to prepare him for the hearing. Jones told Wideman he saw no damaged wheels and that he could not testify in person, but would by telephone.

Watson, another of the six individuals on Plaintiff's witness list, showed up at the meeting at 10:30 a.m.

During the meeting, Wideman again informed Plaintiff that he had been unable to contact three of the six individuals on Plaintiff's witness list - Barlow, Jordan and Pruitt. Wideman asked plaintiff if he had any information other than what he had previously provided to help Wideman get in touch with the three. Plaintiff responded he had no additional information regarding their whereabouts and that his attempts to reach the three had likewise been unsuccessful. Plaintiff testified during his deposition that he had no recollection of what occurred at the January 15, 2008 preparatory meeting. In his subsequent affidavit, Plaintiff avers that he restated that 139 damaged wheel assemblies did not pass through the audit ship station.

As part of his hearing preparations, Wideman, accompanied by Beck, toured the plant within the week prior to the hearing.

As scheduled, hearing was held before Arbitrator Suardi on January 22, 2008. The company was represented by counsel and servicing representative Wideman appeared on behalf of the Local. At the start of the hearing the company and union stipulated to a number of exhibits, including the MSXI-Local 282 collective bargaining agreement and the two discharge grievances.

The company then put on its case as it had the burden pursuant to Article IV(12) of the CBA to demonstrate cause for terminating plaintiff's employment.

The company called three witnesses and introduced seven exhibits. The company's case included evidence of the costs, some $7,500.00, to replace the defective wheel assemblies, costs it would not have incurred had Plaintiff timely detected the damaged wheel assemblies as they passed through the Audit Ship Station on December 5, 2006.

The union then presented its case, calling four witnesses and introducing two exhibits. The four witnesses called by the union were Watson, Saucedo, Local 282 committeeman Beck and Plaintiff.

Plaintiff testified that he could not remember much about the arbitration, however, in his subsequent affidavit, he avers he recalls that Wideman refused to challenge the evidence of the 139 damaged wheel assemblies offered by MSXI.

Despite having assured Wideman that he would appear to testify at the hearing, Jones was a "no show." Wideman did not bring Jones' telephone number with him and did not ask Plaintiff for his phone number.

Plaintiff acknowledges that Committeeman Beck testified on his behalf and in support of the grievances:

Plaintiff also acknowledges that he testified fully on his own behalf:

Further, on direct examination Wideman elicited from Saucedo and Watson the testimony sought by plaintiff.

Following the hearing, the company and union submitted post-hearing briefs, both adjudged by Arbitrator Suardi as "capable."

On March 7, 2008, Arbitrator Suardi issued his award denying the discharge grievances and upholding plaintiff's termination. In his 15 page award, Arbitrator Suardi found that the company had cause to terminate plaintiff for gross negligence, the issue raised in Grievance No. 030583, and that plaintiff's race did not factor into the company's termination decision, the issue raised in Grievance No. 030582.

With respect to his finding that the company had cause to terminate plaintiff, Arbitrator Suardi provided:

> Having established both a duty to inspect and breach of that duty, the question becomes one of damage. At the hearing, Supervisor Maxwell testified that one hundred forty (140) sets of assemblies had defects. Many of the sets were able to be retrieved before they left the facility. Others were put on hold by Chrysler and returned. Importantly all of the witnesses agreed that the scratches and gouges depicted in the photographs were unacceptable. And as for the extent of the unacceptable assemblies, the Arbitrator agrees with the Employer that there comes a time when simple neglectbecomes negligence, and gross negligence. [footnote omitted]
>
> Borrowing from Mr. Saucedo's testimony, though the job is 'easy,' a trailer and a half of bad product is serious. Further, while bad assemblies may have escaped the Audit Ship Station in the past, Mr. Saucedo could not give a number or describe the damage involved. For his part, Mr. Watson never saw more than two to three (2-3) bad assemblies. By contrast, rework on the assemblies which got by the Grievant cost the Employer approximately seven thousand five hundred dollars ($7,500.00).

Crediting [plant manager] Snyder, the number of defective items the Grievant let pass was unprecedented. The difficulties associated with the incident were also significant. They put the Employer's reputation with Chrysler at risk. Quoting Mr. Snyder '[t]here's no reasonable way that somebody could have missed deficiencies of the magnitude the Grievant missed.' The Arbitrator agrees.

If repeated errors in allowing defective product to pass is truly the norm at the plant, the Arbitrator would take that factor into account. However, the contrary appears to be true. And while the Grievant may have seen others allowing defective assemblies to pass downstream or onto a trailer, it was the extent of the defective assemblies on December 5 and their related costs which caused the discipline to be imposed. In the Arbitrator's opinion, the Employer has established its case for gross negligence.

Arbitrator Suardi also rejected Plaintiff's testimony denying he initially

acknowledged responsibility for the damaged wheel assemblies getting past the

Audit Ship Station undetected:

The next question is whether the Grievant breached his duty to inspect the assemblies which were later found to be defective. The Arbitrator believes that he did. At the hearing, there was a good deal of evidence regarding what the Grievant said at the time of the incident and when he was suspended pending investigation the following day. Both Mr. Maxwell and Ms. Davis recalled the grievant saying "my bad" and taking responsibility for what occurred. The termination letter of December 14, 2006, also reflects the Grievant's admission that he was responsible for the oversight.

At the hearing, the Grievant denied saying "my bad," and he denied being responsible for what occurred. In this regard, the Grievant's suspension grievance and his testimony reflect a belief

that others may have been at fault (e.g., maintenance, Mr. Jones, the temporary assistant, or the weight station operator). Correctly viewed, however, the Grievant's unqualified contemporaneous admission is far more believable than his after-the-fact theories of blame.

With respect to his finding that discrimination played no role in the

company's decision to terminate plaintiff, Arbitrator Suardi provided:

> For his part, the Grievant offered a 'no probable cause' letter from the MCHR and a right to sue letter from the EEOC. As for the former, a no probable cause letter can be construed as meaning exactly that, that the MCHR found no causal connection between the Grievant's complaint and the existence of racial discrimination. As for the right to sue letter, it does not, as the Grievant contends, amount to a showing that discrimination exists. To the contrary, such a letter gives the complaining party the right to pursue that question in court. Suffice it to say that, at best, the proffered administrative documentation permits the Grievant a *claim* of discrimination, but it is not *proof* of discrimination.

> Of more relevance was [union committeeman] Beck's testimony. He expressed his belief that the Grievant was singled out for discipline because of the help he gave co-workers, because he filed grievances, and because of his race. The Union, too, sought to portray the Grievant as a 'pain in the a**' to management. While the fact the Grievant may have assisted his co-workers has been considered, there is nothing to indicate he was cloaked with protective status when he did so. Similarly, the fact the Grievant filed many grievances does not, in itself, insulate himself from discipline which is otherwise deserved.

> It is also noteworthy that while [union committeeman] Beck gave credible testimony about his perceptions ('perception is 9/10 of the law' according to Mr. Beck), perception is not, with all due respect, the legal standard applied by trained human resource

representatives, such as Ms. Davis. From all this, the Arbitrator concludes that whatever discipline was imposed on the Grievant was not influenced by his race, but rather by the severity and effect of his negligent conduct on the Employer's business. In legal terms, the Employer articulated a legitimate, non-discriminatory reason, devoid of pretext, for the Grievant's termination, even if he had established a prima facie case of discrimination.

Of all of the grievances filed against MSXI between May 13, 2004, the CBA start date, and the closing of the plant in 2008, those protesting Plaintiff's termination were the only ones ever taken to arbitration.

Article 33 of the UAW Constitution sets forth procedures to appeal from the actions or decisions of the International Union, its subordinate bodies, including affiliated local unions, or any agent or official in the UAW.  Article 33, Section 5 of the UAW Constitution provides:

> **Section 5.** Obligation To Exhaust Internal Union Remedies. It shall be the duty of any individual or body, if aggrieved by any action, decision or penalty imposed, to exhaust fully the individual or body's remedy and all appeals under this Constitution and the rules of this Union before going to a civil court or governmental agency for redress.

Since at least 1989, copies of the UAW Constitution have been available at no cost to all Local members at the Local 282 hall/office.

At no time has Plaintiff ever filed internal appeal pursuant to Article 33 of the UAW Constitution challenging the processing of Plaintiff's discharge grievances by

the Local or UAW servicing representative Wideman. Plaintiff was unaware of Article 33 and was not advised of it by Wideman.

No MSXI supervisor or manager made racially derogatory comments to Plaintiff while he worked for MSXI. No union officer or representative made any racially derogatory comments to Plaintiff while he worked at MSXI.

Plaintiff admits that if he allowed damaged wheels pass his audit station, he was not doing his job, although he denies having allowed the 139 damaged wheel assemblies to pass through.

## Standard of Review

The standard for summary judgment is well settled. In determining whether summary judgment should issue, the Court must view the facts and inferences from the facts in the light most favorable to the nonmoving party. *Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986); "Summary judgment is appropriate when the record, viewed in the light most favorable to the non-moving party, demonstrates that there is no genuine issue of material fact and the moving party is entitled to judgment as a matter of law." *Myers v. Lutsen Mtns. Corp.*, 587 F.3d 891, 893 (8th Cir.2009). If a nonmoving party has failed to establish the existence of an element of that party's claim, summary judgment is appropriate. *Celotex Corp. v. Catrett*, 477 U.S. 317, 322-23 (1986)" *Cole v.*

*Homier Distributing Co., Inc.,* 2010 WL 1171741, 6 (8th Cir. 2010). The moving

party has the burden to establish both the absence of a genuine issue of material fact

and that it is entitled to judgment as a matter of law. Fed.R.Civ.P. 56(c); *Anderson*

*v. Liberty Lobby, Inc.*, 477 U.S. 242, 247 (1986); *Celotex,* 477 U.S. at 322;

*Enterprise Bank v. Magna Bank*, 92 F.3d 743, 747 (8th Cir. 1996). Once the

moving party has met this burden, the nonmoving party may not rest on the

allegations in his pleadings but by affidavit or other evidence must set forth specific

facts showing that a genuine issue of material fact exists. Fed.R.Civ.P. 56(e);

*Anderson* 477 U.S. at 256; *Khoury v. Group Health Plan,* Inc., 2010 WL 3119894

(8th Cir. 2010); *Littrell ,* 459 F.3d at 921. "The party opposing summary judgment

may not rest on the allegations in its pleadings; it must 'set forth specific facts

showing that there is a genuine issue for trial.'" *United of Omaha Life Ins. Co. v.*

*Honea,* 458 F.3d 788, 791 (8th Cir.2006) (quoting Fed.R.Civ.P. 56(e)). To survive

a motion for summary judgment, the "nonmoving party must 'substantiate his

allegations with sufficient probative evidence [that] would permit a finding in [his]

favor based on more than mere speculation, conjecture, or fantasy.' *Wilson v. Int'l*

*Bus. Machs. Corp.*, 62 F.3d 237, 241 (8th Cir. 1995)(quotation omitted)." *Putman*

*v. Unity Health System*, 348 F.3d 732, 733-34 (8th Cir. 2003). A plaintiff may not

merely point to unsupported self-serving allegations, but must substantiate

allegations with sufficient probative evidence that would permit a finding in the plaintiff's favor. *Wilson v. Int'l Bus. Mach. Corp.,* 62 F.3d 237, 241 (8th Cir.1995); *Smith v. International Paper Co.*, 523 F.3d 845, 848 (8th Cir. 2008). A party cannot "'create a genuine issue of material fact simply by submitting an affidavit that contradicts] testimony at a prior deposition, where there [are] no "legitimate reasons" for the filing of an inconsistent affidavit.'" *Frevert v. Ford Motor Co.*, 2010 WL 2813555 (8th Cir. 2010). "The mere existence of a scintilla of evidence in support of the plaintiff's position will be insufficient; there must be evidence on which the jury could reasonably find for the plaintiff." *Anderson,* 477 U.S. 242 at 252; *Davidson & Associates v. Jung* 422 F.3d 630, 638 (8th Cir. 2005); *Smith*, 523 F.3d at 848.

"Mere allegations, unsupported by specific facts or evidence beyond the nonmoving party's own conclusions, are insufficient to withstand a motion for summary judgment." *Thomas v. Corwin,* 483 F.3d 516, 526-7(8th Cir. 2007). "Simply referencing the complaint, or alleging that a fact is otherwise, is insufficient to show there is a genuine issue for trial." *Kountze ex rel. Hitchcock Foundation v. Gaines*, 536 F.3d 813, 817 (8th Cir. 2008).

While the moving party bears "the initial burden of informing the district court of the basis for its motion, and identifying those portions of the pleadings," the

discovery, disclosure materials and affidavits "which it believes demonstrate the absence of a genuine issue of material fact," *Celotex,* 477 U.S. at 323 it is incumbent on the party with the burden of proof at trial to present sufficient evidence to establish the elements essential to its claims. See Celotex, 477 U.S. at 322-23. Thus, Plaintiff, even though the non-moving party for summary-judgment purposes, "must still 'present[ ] evidence sufficiently supporting the disputed material facts [such] that a reasonable jury could return a verdict in [its] favor.' " *Pope v. ESA Servs., Inc.*, 406 F.3d 1001, 1003-04 (8th Cir.2005) (quoting *Gregory v. City of Rogers*, 974 F.2d 1006, 1010 (8th Cir.1992)). *Glorvigen v. Cirrus Design Corp.,* 581 F.3d 737, 742 -743 (8th Cir. 2009).

## MSXI Motion for Summary Judgement

Plaintiff alleges race discrimination in violation of Title VII of the Civil Rights Act in MSXI's termination of his employment. Because there is no evidence of direct discrimination, the Court analyzes Plaintiff's claim under *McDonnell Douglas Corp. v. Green*, 411 U.S. 792, 802-04 (1973). Under this framework, Plaintiff must establish a *prima facie* case of discrimination. Plaintiff must show that he: (1) is a member of a protected class; (2) was meeting his employer's legitimate job expectations; (3) suffered an adverse employment action; and (4) was treated differently than similarly-situated employees who were not members of her

protected class.  *Norman v. Union Pacific R.R. Co.,* 606 F.3d 455, 461 (8th Cir. 2010).

Based on the evidence before the Court, Plaintiff cannot establish a *prima facie* case.  Plaintiff was discharged based on MSXI's determination that he was responsible for gross negligence in allowing 139 damaged wheel assemblies through the audit station.  Investigation of the timing of the passing of the damaged wheel assemblies revealed that they passed through during Plaintiff's shift.  In response, Plaintiff presents no evidence, other than the unsubstantiated claims of Plaintiff and Jones that these damaged wheels did not pass through his station.

Additionally, there is no evidence that similarly situated employees who were not members of the protected class received different treatment than Plaintiff.  At the *prima facie* stage, the test to determine whether a fellow employee is similarly situated is "not onerous," and the Court "must not conflate the prima-facie case with the ultimate issue of discrimination."  *Williams v. Ford Motor Co*, 14 F.3d 1305, 1308 (8th Cir. 1994).  To satisfy the "similarly situated" element of a *prima facie* case of discrimination, however,  Plaintiff must produce evidence that he and other employees were "involved in or accused of the same or similar conduct and [were] disciplined in different ways."  *Wimble v. Cashion*, 588 F.3d 959, 962 (8th Cir. 2009).    While Plaintiff attempts to establish this element, Plaintiff presents

incidents of other employees' "bad work histories." These incidents, however do not involve the same or similar conduct and therefore Plaintiff cannot satisfy his burden of producing evidence that similarly situated employees were treated differently. *Wimble*, 588 F.3d at 962.

Even assuming Plaintiff could establish a *prima facie* case of racial discrimination, MSXI has set forth a legitimate nondiscriminatory reason for firing him. Based on its investigation of the 139 damaged wheel assemblies, MSXI concluded that they passed through on Plaintiff's watch. Plaintiff has presented no evidence, other than his subjective belief and that of Jones that Plaintiff did not miss the damaged wheel assemblies. Given the records that corresponded with the passing of the damaged wheel assemblies, Plaintiff cannot show MSXI's finding of gross negligence on the part of Plaintiff was pretextual. "'Federal courts do not serve as "super-personnel departments" sitting in judgment of an employer's business decisions absent evidence of discrimination.'" *Chism v. Curter*, 2010 WL 3396842 (8th Cir. 2010), quoting *Anderson v. Durham D& M, L.L.C.*, 606 F.3d 513, 522 (8th Cir. 2010). Indeed, the finding by the arbitrator that MSXI's firing of Plaintiff did not violate the collective bargaining agreement, and was not based on Plaintiff's race is further evidence that Plaintiff cannot establish that MSXI's reason for the discharge was not pretextual.

Plaintiff has not met his burden of presenting a *prima facie* case of racial discrimination. As such, MSXI is entitled to judgment as a matter of law on Count I of Plaintiff's Second Amended Complaint.

Union's Motion for Summary Judgment

Defendant UAW moves for summary judgment as time barred.  It is well established that the applicable statute of limitations on a Section 301 duty of fair representation claim is six months.  *DelCostello v. International Bhd. Of Teamsters*, 462 U.S. 151 (1983).  The cause of action accrues on the date Plaintiff discovered conduct allegedly giving rise to Plaintiff's claims.

In *Livingstone v. Schuck Market, Inc.*, 950 F.2d 579 (8th Cir. 1991), the Eighth Circuit concluded that a cause of action accrued when an unfair labor practice charge was filed:

> In the present case the district court found that appellant's cause of action accrued at the latest on November 7, 1988, the date on which appellant's unfair labor practice charge was filed. Under *Gustafson*, the district court could have found that appellant's cause of action accrued on October 17, 1988, the date appellant alleged in his NLRB charge that Local 610 had begun to breach its duty of fair representation.
>
> We agree with the district court's finding. Because appellant did not file his complaint until September 1, 1989, approximately ten months after he was aware of the union's alleged breach, the district court correctly found that appellant's cause of action was time-barred.
>
> Appellant argues that the six-month statute of limitations was tolled

due to the employer's and union's misconduct. However, this court has never required that the union give the employee unequivocal notice before the employee's cause of action begins to accrue. Instead, *what is important is the date on which the union "engaged in the acts of unfair representation in the grievance process." Id.* at 79.

*Livingstone*, 950 F.2d at 583. (Emphasis added). Plaintiff filed his charge of discrimination against the Local with the EEOC and the Missouri Commission on Human Rights on April 23, 2007. In his charge, he contended that he was not being properly represented in his grievance procedure. Plaintiff also filed an unfair labor practice charge against the Union on April 23, 2007, in which Plaintiff claimed that the Local had failed to properly process a grievance in regard to his discharge. Clearly, on April 23, 2007, at the very latest, Plaintiff claimed that the Union was engaging in what he believed was a breach of the duty to fairly represent him. Plaintiff did not commence this suit until March 11, 2008, more than six months after Plaintiff's charges.

Plaintiff responds that he should not be required to file his suit while the grievance procedure was pending. Plaintiff fails to present any authority which would allow him to postpone filing this action during the pendency of the grievance process. As Defendant points out, Plaintiff could have requested a stay in this Court pending completion of the grievance procedure. Plaintiff's argument fails under the unequivocal language of *Livingstone*. Plaintiff's charges clearly reflect his belief

that the Union was breaching its duty to Plaintiff. It was, therefore, at that time that his cause of action accrued. Accordingly, because Plaintiff failed to file his action within six months of the accrual of his action, the action is time barred. The Union is therefore entitled to judgment as a matter of law.

## Conclusion

The record before the Court establishes that there are no disputed issues as to any material facts with regard to Plaintiff's discrimination claim against MSXI. Plaintiff has failed to present a *prima facie* case of discrimination, and MSXI has established that it had a legitimate nondiscriminatory reason for discharging Plaintiff.

Plaintiff's action against Defendant UAW Local 282 is barred by the applicable six month statute of limitations. Defendant is therefore entitled to judgment as a matter of law.

Accordingly,

**IT IS HEREBY ORDERED** that Defendant UAW Local 282's Motion for Summary Judgment, [Doc. No. 112], is **GRANTED**.

**IT IS FURTHER ORDERED** that Defendant MSX International Platform Services, LLC's Motion for Summary Judgment, [Doc. No. 113], is **GRANTED**.

A separate judgment in accordance with this Opinion, Memorandum and

Order is entered this same date.

Dated this 3rd day of September, 2010.

_____
HENRY EDWARD AUTREY
UNITED STATES DISTRICT JUDGE